

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

MAY 2 6 2020

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| LARRY STEVEN WILKINS and JANE B. STANTON,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CV 18–147–M–DLC–KLD<br><br><br>ORDER |

On February 4, 2020, United States Magistrate Judge Kathleen L. DeSoto entered her Findings and Recommendation recommending that the Government's Motion to Dismiss for lack of subject matter jurisdiction be denied. (Doc. 53.) The Government timely objects and so is entitled to de novo review. 28 U.S.C. § 636(b)(1)(C).

## BACKGROUND

In 1962, Plaintiffs Larry Steven Wilkins and Jane B. Stanton's predecessors-in-interest granted the United States an easement for Robbins Gulch Road. (Doc. 1 at 4.) Located off Highway 93, just south of Connor, Montana, Robbins Gulch Road transverses private property for approximately a mile before entering the

boundary of the Bitterroot National Forest.[1]  (Doc. 32-24.)  Plaintiffs each acquired their properties in 1991 and 2004, respectively.  (Doc. 1 at 3.)

Plaintiffs filed this action against the United States under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, alleging that the United States Forest Service has exceeded the scope of its limited easement by failing to "manage . . . this road in accordance with the intended limited use of the road for U.S. Forest Service administrative purposes" and has instead managed the road in a way that has enabled public access, including posting signs that encourage public use.  (Doc. 1 at 2–3, 13.)  Plaintiffs also seek to confirm and enforce the Forest Service's obligation to patrol and maintain the road.[2]  (*Id.* at 14.)  The Government moved to dismiss the action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, asserting that Plaintiffs' action is barred by the QTA's statute of limitations which the Government claims is jurisdictional.  Alternatively, the Government argues that Plaintiffs lack standing because they do not own the land underlying Robbins Gulch Road.  (Docs. 30, 31.)

---

[1] When the Court refers to Robbins Gulch Road hereafter, it will mean only that initial approximate 1-mile portion of the road which traverses private property.

[2] To the extent Plaintiffs' second claim seeks to impose an affirmative action duty on the Forest Service to "maintain and patrol" Robbins Gulch Road, this allegation seems to take this claim outside of the QTA.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).  Nevertheless, having scoured Plaintiffs' complaint and finding no allegation that the Forest Service failed to "patrol" or "maintain" against any threat other than public use, the Court does not find any inference of a stand-alone APA claim.  The Court will therefore construe both claims under the QTA.

Judge DeSoto recommended the Court deny the Government's motion. (Doc. 53 at 1.) First, she determined that Plaintiffs have standing because Montana law presumes that a landowner owns property to the center line of the road. Mont. Code Ann. § 70-16-202. (*Id.* at 8–11.) Additionally, she determined that the United State's easement encroaches on at least five feet of Plaintiffs' properties. (*Id.* at 11.) Then, following the lead of Chief Judge Morris in *Bar K Ranch, LLC v. United States*, No. CV-19-6-BU-BMM, 2019 WL 5328782 (D. Mont. Oct. 21, 2019), Judge DeSoto determined that the QTA's statute of limitations is non-jurisdictional and therefore the Government's motion to dismiss should be construed under 12(b)(6) for failure to state a claim rather than 12(b)(1) for lack of subject matter jurisdiction. (Doc. 53 at 16–17.) Looking only at the allegations in the Complaint, she recommended the Court deny the Government's motion. (*Id.* at 16–19.)

## LEGAL STANDARD

A statute-of-limitations defense is typically raised under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010). However, where the statute of limitations is jurisdictional, and the issue is not "inextricably entwined" with the merits of the case, a court should address the claim under Rule 12(b)(1) for lack of subject matter jurisdiction. *See*

3

*Kingman Reef Atoll Inv., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008); *see also Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011) ("The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction."). An argument that a party lacks statutory standing should be addressed under 12(b)(6). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). Motions under 12(b)(6) and 12(b)(1) are governed by different legal standards.

Under Rule 12(b)(6), "[a] complaint may be dismissed for failure to state a claim only when it fails to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). In resolving the motion, a court takes the well-pleaded factual allegations as true and draw inferences in the plaintiff's favor. *Id.* A court may consider only the allegations in the complaint, documents attached to the complaint, or documents on which the plaintiff's case relies, "the authenticity of which is not contested," even if submitted by the defendant. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) *supersceded on nonrelevant grounds as recognized by Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1158 (9th Cir. 2019).

In contrast, under a Rule 12(b)(1) factual attack (meaning the facts negating jurisdiction exist outside the complaint) no presumption of truthfulness attaches to plaintiff's allegations, a court may freely consider extrinsic evidence, and it may

4

resolve factual disputes with or without a hearing. *Kingman Reef Atoll Inv.*, 541

F.3d at 1195; *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *Rosales*

*v. United States*, 824 F.2d 799, 803 (9th Cir. 1987). Although the defendant is the

moving party, the plaintiff bears the burden of satisfying the court as to its

jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

## DISCUSSION

The Government raises four objections to the Findings and

Recommendation. (Doc. 55.) The Court will consider only its first objection to

the statute-of-limitations issue, as it is dispositive. Judge DeSoto determined that

the QTA's statute of limitations is a mere claim-processing rule after applying the

"clear statement" test set forth in *United States v. Kwai Fun Wong*, 575 U.S. 402

(2015). Chief Judge Morris reached the same conclusion in *Bar K Ranch*, 2019

WL 5328782, at *2–3. The Court takes a different view of it. Recognizing that its

decision today creates an intra-district split on an issue critical to the disposition of

property rights in Montana, the Court believes that it is bound by the Supreme

Court's decision in *Block v. North Dakota ex rel. Board of University & School*

*Lands*, 461 U.S. 273 (1983) and Ninth Circuit law holding that the QTA's statute

of limitations is jurisdictional. Ultimately, it is up to the Ninth Circuit to decide

whether *Wong* is "clearly irreconcilable" with its prior settled precedent. *Miller v.*

*Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). For the reasons explained,

the Court will grant the Government's motion to dismiss because Plaintiffs' claim is untimely and the Court lacks jurisdiction to consider it.

## I.    The Quiet Title Act's Statute of Limitations

In *Block*, the Supreme Court defined the scope of the QTA when it determined that North Dakota's challenge to the United States' "competing claims to title of certain portions of the bed of the Little Missoula River" was barred, assuming the district court determined that the statute of limitations had run. *Block*, 461 U.S. at 277, 292–93.  In a narrow sense, the Supreme Court addressed only two questions.  It first considered whether the QTA provided the exclusive remedy to challenge the United States' competing claim to title of real property. *Id.* at 276–77.  Then it considered whether the QTA's statute of limitations applied equally to states. *Id.* at 277.  In a broader sense, however, the Court's opinion was all about the limits of Congress's waiver of sovereign immunity, a jurisdictional prerequisite.

At trial, North Dakota introduced evidence that the Little Missouri River was navigable at statehood so that under the equal footing doctrine title passed at that time from the United States to North Dakota. *Id.* at 279.  The government did not introduce evidence to rebut the merits—instead, it defended the case on the grounds that the twelve-year statute of limitations had run prior to North Dakota's commencement of the suit. *Id.* at 278–79.  The district court ruled in North

6

Dakota's favor on navigability and rejected and government's statute-of-limitations defense by applying "the rule of construction that statutes of limitations do not apply to sovereigns unless a contrary legislative intention is clearly evidence from the express language of the statute[.]" *Id.* at 279. The court of appeals affirmed, and the Supreme Court granted certiorari. *Id.*

First, the Court addressed whether a plaintiff could avoid the QTA's statute of limitations by invoking another basis for relief. *See id.* at 280–81. In answering "no," the Court reviewed the political and legislative backdrop of the QTA. *Id.* at 280–85. Because suits against the federal government are barred by sovereign immunity unless waived by Congress, early plaintiffs seeking title from the United States experienced limited and inconsistent success. *Id.* at 280. Plaintiffs could attempt to plead around sovereign immunity by bringing an "officer's suit"—a suit against a specific government official charged with administering the area—or they could attempt to induce the government to sue them. *Id.* at 280–81. Although the Supreme Court accepted the officer's suit in early cases, in *Malone v. Bowdoin,* 369 U.S. 643 (1962), the Court mostly foreclosed that possibility, holding that officers' suits were only viable when the officer's actions were not authorized by law. *Id.* at 281.

In passing the QTA, Congress sought to provide a consistent remedy for plaintiffs to obtain title. *Id.* at 282. Congress's initial draft was met with

7

opposition from the executive branch who feared that recognizing this cause of action would create an unmanageable workload for government attorneys and the courts. *Id.* The executive branch favored a "more-elaborate bill" with "appropriate safeguards for protection of the public interest." *Id.* at 282–83. Its proposal "limited the waiver of sovereign immunity in several important respects," by excluding Indian lands and ongoing federal programs, having prospective effect only, and providing a six-year statute of limitations to ensure the government did not have to defend against stale claims. *Id.* at 283. The Senate largely accepted the executive's proposal with one exception—it did not believe the bill should have prospective effect only. *Id.* In the final compromise, Congress enacted the QTA with a twelve-year statute of limitations and prospective-only language. *Id.* This longer window gave the law retroactive effect for a limited period. *Id.*

The Court found this history determinative of the first question. *Id.* It reasoned that if North Dakota were able to circumvent the QTA by asserting any other theory such as an officer's suit, it would render null Congress's "carefully crafted provisions . . . deemed necessary for protection of the national public interest." *Id.* at 284–85. The Court then held that the QTA provides the exclusive remedy. *Id.* at 286.

Turning to the second question, the Court addressed whether the statute of limitations applied equally to states. *Id.* at 287. The Court observed the common

8

principle that where Congress attaches a condition to the waiver of sovereign immunity, that condition ought to be strictly observed. *Id.* Searching the text and legislative history, the Court found no evidence that Congress intended to expand its waiver of sovereign immunity by allowing states to bring claims beyond the 12-year window. *Id.* The Court ultimately decided that "States must fully adhere to the requirements" of the QTA, including its statute of limitations. *Id.*

On whole, *Block* stands for the proposition that the express terms of the QTA provide the universe of claims that may be brought against the United States over disputes concerning real property. This is because "[w]hatever the merits of the title dispute may be, . . . if North Dakota's suit is barred by [the statute of limitations], the court below had no jurisdiction to inquire into the merits." *Id.* Three years later, the Court reiterated this principle stating that "[w]hen the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz*, 476 U.S. 834, 841 (1986) (citing *Block*, 461 U.S. at 586). Then, over a decade later, the Supreme Court spoke again in jurisdictional terms, holding that once the statute of limitations begins to run, that window cannot be equitably tolled. *United States v. Beggerly*, 524 U.S. 38, 48 (1998). "This is particularly true given that the QTA deals with ownership of land. It is of special importance that landowners know with certainty what their rights are, and the period during which those rights may

9

be subject to challenge." *Id.* at 48–49. The Court reasoned that permitting
"[e]quitable tolling of the already generous statute of limitations incorporated in
the QTA would throw a cloud of uncertainty over these rights," something that is
"incompatible with the Act." *Id.* at 49.

In the early 1990s, the Supreme Court began to rethink whether the various
procedural prerequisites for bringing suit against the federal government ought to
define the scope of the court's subject matter jurisdiction. *See Irwin v. Dep't of
Vet. Aff.*, 498 U.S. 89, 95–96 (1990) (holding that the 30-day time limit to file suit
against a federal employer is non-jurisdictional and a rebuttable presumption of
equitable tolling applies to cases against the government); *Kingman Reef Atoll Inv.,
L.L.C.*, 541 F.3d at 1196 (listing cases). Consistent with this trend, in 2015, the
Supreme Court held that the Federal Tort Claims Act's statute of limitations is
non-jurisdictional. *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015).
Extending *Irwin*'s rebuttable presumption, *Wong* held that for a time bar to be
jurisdictional, the government must show some "clear statement" that Congress
intended such a result. *Id.* at 408–10. The Court reasoned that the language of the
time bar itself was not necessarily controlling because most are written with
forceful mandatory language. *Id.* at 408–10, 415–17. Nor does it make a
difference that a "time bar conditions a waiver of sovereign immunity." *Id.* at 420.
To find a "clear statement," Congress must do "something special, beyond setting

10

an exception-free deadline [in order] to tag a statute of limitations as jurisdictional." *Id.* at 410.

However, the Court in *Wong* also affirmed that its prior decision in *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 138 (2008) (holding that the Tucker Act's time bar is jurisdictional) remained good law. *Id.* at 416.  The Court justified its arguably incompatible treatment of the Tucker Act by explaining that the difference came "down to two words: stare decisis." *Id.*  By excluding *John R. Sand & Gravel Co.* from its scope, the Court explained that "in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Id.*

In 2005, citing *Block*, the Ninth Circuit held that the QTA's statute of limitations is jurisdictional.  *Skranak v. Castenada*, 425 F.3d 1213, 1216 (9th Cir. 2005).  In *Skranak*, the court raised the issue sua sponte, reversed the district court's grant of summary judgment to the plaintiffs, and remanded for the district court to determine whether the plaintiffs' claim was timely, which would in turn govern whether the court had subject matter jurisdiction over the case.  *Id.* at 1216–17.  Subsequently in *Kingman*, the plaintiff asked the Ninth Circuit to reconsider *Skranak*, citing *Irwin* for that proposition that the Supreme Court was no longer treating claim-processing requirements as jurisdictional barriers. *Kingman Reef Atoll Inv.*, 541 F.3d at 1196.  The Ninth Circuit declined to read

11

*Irwin* as overruling *Block* and noted that it was bound by its own precedent interpreting *Block* as "directly control[ling]." *Id.* (citing *Fidelity Exploration and Prod. Co. v. United States,* 506 F.3d 1182, 1186 (9th Cir. 2007) (affirming that *Block* pronounced that the QTA's statute of limitations is jurisdictional)). The Ninth Circuit has affirmed its adherence to this rule in, at least, four published opinions. *Kingman Reef Atoll Inv.*, 541 F.3d at 1196; *Fidelity Exploration and Prod. Co.*, 506 F.3d at 1186; *Skranak*, 425 F.3d at 1216; *Adams v. United States*, 255 F.3d 787, 796 (9th Cir. 2001). It has even done so after *Wong*, albeit in a memorandum disposition. *Hein v. United States*, 783 F. App'x 650, 651 (9th Cir. 2019).

Although two district courts have determined that the QTA's statute of limitations is non-jurisdictional, *Bar K Ranch*, 2019 WL 5328782, *2–3, *Payne v. United States Bureau of Reclamation*, No. CV1700490ABMRWX, 2017 WL 6819927, at *2 (C.D. Cal. Aug. 15, 2017), these decisions appear to be outliers, and the Court is not persuaded by their reasoning. First, both courts assumed without deciding that *Block*'s pronouncement that the QTA's statute of limitations is jurisdictional was obitur dictum. As such, neither court consider whether, as Supreme Court judicial dicta, the statement ought to be given greater persuasive weight. *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000). Even assuming *Block*'s statement is not binding law, neither court read

12

*Block* alongside *Beggerly*'s conclusion that once that QTA's statute of limitations begins it cannot be equitably tolled. *Beggerly*, 524 U.S. at 48. Then, both courts disregarded settled Ninth Circuit precedent without addressing the relevant standard for doing so. *See Bar K Ranch*, 2019 WL 5328782, *2 (determining that *Wong* "cast doubt" upon once "seemingly clear" law); *Payne*, 2017 WL 6819927, at *2 (failing to address Ninth Circuit law entirely). Finally, neither court considered whether the QTA's negotiated safeguards constitute a "clear statement" that Congress intended its statute of limitations to be jurisdictional. For these reasons, the Court believes these decisions reached the wrong result.

As an initial matter, the Court reads *Block*'s pronouncement that the QTA's statute of limitations is jurisdictional as part of the Court's holding. The Ninth Circuit has defined a holding as a statement "germane to the eventual resolution of the case, . . . resolve[d] . . . after reasoned consideration in a published opinion." *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (Kozinski, C.J., concurring); *Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc) (adopting Judge Kozinski's definition in the majority opinion); *see also* Ryan S. Killian, *Dicta and the Rule of Law*, 2013 Pepp. L. Rev. 1, 11–14 (2013). Applying this definition, *Block*'s statement is binding law because it was critical to the Court's reasoning on an issue actually decided. In answering both questions posed by North Dakota, the *Block* Court was principally swayed by the compromise

13

struck between the legislative and executive branches. *Block*, 461 U.S. at 280–85.
The Court determined that all of the strings that Congress had attached to the QTA,
such as its statute of limitations ("the one point on which the Executive Branch
was most insistent," *id.* at 285,) defined the limits on its waiver of sovereign
immunity, i.e. the Court's power to hear the case, *id.* at 290–91. Although *Wong*
subsequently said that this reasoning is not dispositive of whether a statute of
limitations is jurisdictional when interpreted for the first time today, this reasoning
was critical to the Court's resolution of *Block*, making it a part of the Court's
holding.

Whatever ambiguity persisted after *Block*, the *Beggerly* Court doubled down
on Congress's limited waiver of sovereign immunity by prohibiting equitable
tolling. *Beggerly*, 524 U.S. at 49. The Court recognized the "special importance
that landowners know with certainty what their rights are, and the period during
which those rights may be subject to challenge." *Id.* Even if a high court's
individual decision does not create a rule a property, a series of decisions read
together may, particularly when those decisions create reliance interests. *See, e.g.,*
*Christy v. Pridgeon*, 71 U.S. (4 Wall.) 196, 200 (1866) (per Field, J.); *Bogle*
*Farms, Inc. v. Baca*, 925 P.2d 1184, 1193 (N.M. 1996). Together *Block*, *Mottaz*,
and *Beggerly* provide a rule of property which requires courts to give stare decisis
"peculiar force and strictness," *Abbott v. City of Los Angeles*, 326 P.2d 484, 494–

14

95 (Cal. 1958), because "in questions which respect the rights of property, it is better to adhere to principles once fixed . . . than to unsettle the law in order to render it more consistent with the dictates of sound reason," *Marine Ins. Co. of Alexandria v. Tucker*, 7 U.S. (3 Cranch) 357, 388 (1806) (per Washington, J.).

Although, admittedly, *Skranak* did not discuss whether *Block*'s statement about the jurisdictional nature of its decision occurred in holding or dictum, the Ninth Circuit's pronouncement itself is the binding law of the circuit. The Ninth Circuit has said as much in a subsequent case. *Kingman Reef Atoll Inv.*, 541 F.3d at 1196.

If a district court disagrees with the Ninth Circuit or believes it to have taken an erroneous view of Supreme Court law, that court is still bound by the law of the circuit unless a superseding Supreme Court opinion "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900. To be "clearly irreconcilable" means there can be no interpretation that renders the superseding Supreme Court case harmonious or compatible with the prior law. It is not enough that a subsequent case merely "cast doubt" upon an older decision.

*Wong* is not "clearly irreconcilable" with *Block* because *Wong* expressly exempted prior settled cases from reassessment. The Eleventh Circuit—the only circuit court to have squarely addressed the issue—dismissed it in a footnote,

15

observing that its decision to enforce the QTA's jurisdictional bar is consistent with *Wong* because *Wong* requires adherence to stare decisis. *F.E.B. Corp. v. United States*, 818 F.3d 681, 686 n.3 (11th Cir. 2016).

Even if *Wong* created a clear conflict to the extent that a court was no longer bound by Ninth Circuit law, as *Block* describes, Congress provided a "clear statement" that it intended the QTA to be jurisdictional. During the drafting process, Congress was sensitive to the executive branches' chief concern that the failure to implement "appropriate safeguards" would create an unmanageable workload for federal employees. *Block*, 461 U.S. at 283–84. The final draft of the QTA recognized this concern by excluding Indian lands and ongoing federal projects and authorizing only prospective actions brought within twelve-years of accrual. *Id.* If the statute of limitations is non-jurisdictional, stale claims are often not appropriately dismissed on the pleadings, as apparent by this litigation. Reading Congress's twelve-year statute of limitations to circumscribe a jurisdictional bar protects the compromise struck by congress and the executive branch by ensuring that time-barred claims are easily dismissed at the outset. This is Congress's "clear statement."

Following the binding precedent of the Supreme Court and Ninth Circuit Court of Appeals, the QTA's statute of limitations is jurisdictional. Accordingly, the Government's motion is properly analyzed under Federal Rule 12(b)(1).

## II.   Timeliness

The QTA's statute of limitations begins to run when a plaintiff's claim accrues. "Such an action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). The phrase "'should have known' imparts a test of reasonableness." *Shultz v. Dep't of Army, U.S.*, 886 F.2d 1157, 1160 (9th Cir. 1989) (quoting 28 U.S.C. § 2409a(g)). A claim accrues when the United States' actions "would have alerted a reasonable landowner" to the adverse interest of the United States. *Id.*

Plaintiffs correctly observe that actions that would constitute accrual over a fee dispute do not necessarily put a reasonable landowner on notice of the government's adverse interest when the property at issue is an easement. (Doc. 35 at 23; *McFarland v. Norton*, 425 F.3d 724, 726–27 (9th Cir. 2005).)

> For example, in *Michel v. United States*, the Ninth Circuit explained:
>
> If a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period. But when the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim. A plaintiff's cause of action for an easement across government land only accrues when the government, "adversely to the interests of plaintiffs, denie[s] or limit[s] the use of the roadway for access to plaintiffs' property."

65 F.3d 130, 132 (9th Cir. 1995) (per curiam) (internal citations omitted).

Subsequently in *McFarland v. Norton*, the Ninth Circuit clarified that

regulatory or supervisory actions taken by the government are often consistent with

its right as owner of the servient estate and, where so, those actions do not cause a

claim to accrue. 425 F.3d at 727. There, plaintiffs were landowners who claimed

an easement over parts of Glacier National Park to access their private parcel

within the park's boundaries. *Id.* at 725. The district court concluded that the

claim accrued in the 1970s when the Park Service erected a locked gate restricting

wintertime access, which required the plaintiffs to request permission from the

Park Service to access their property. *Id.* at 726. The Ninth Circuit reversed,

finding that the Park Service's decision to restrict wintertime motorists was

consistent with its regulatory authority as the owner of the servient tenement. *Id.*

at 727–28. The court clarified that when it comes to easements the analysis is

different because a "claim to ownership and control of the servient tenement can be

entirely consistent with private ownership of an easement." *Id.* at 727.

> To avoid forcing landowners and the government into "premature, and
> often unnecessary, suits" [a court] should not lightly assume that
> regulatory or supervisory actions, as opposed to those that deny the
> easement's existence, will trigger the statute of limitations. Were it not
> so, any regulation of a property interest would challenge ownership of
> the interest itself.

*Id.* (citing *Michel*, 65 F.3d at 132 (internal citations omitted)). The court reasoned

that requiring private owners to request permission to enter through an otherwise

locked gate did not trigger the statute of limitations when there was no evidence

18

that any landowner was denied access when the road was passable. *Id.* at 728. Instead, the court determined that the claim accrued in 1999 when the Park Service informed the plaintiffs of its new policy that no motorists would be allowed access while the road was closed. *Id.*

Unlike the cases above where it was the plaintiffs who claimed an easement and the government who owned the servient estate, the opposite is true here. Plaintiffs argue that this makes the "peaceful coexistence" of the Forest Service's regulatory actions and the landowner's view of the easement "especially likely." (Doc. 35 at 23.) But the Court does not share this view. Whether the Forest Service is exercising regulatory control as owner of the easement or the servient estate makes little difference. Plaintiffs argue that the Forest Service has managed the road in violation of its limited easement by facilitating public access. The question then is when a reasonable landowner would have known that the Forest Service believed its easement granted public access or opened the road to the public.

As a preliminary matter, the Court must decide whether answering this question is appropriate on the pleadings or whether the issue is "inextricably entwined" with the merits. "Such an intertwining of jurisdiction and merits may occur when a party's right to recovery rests upon the interpretation of a federal statute that provides both the basis for the court's subject matter jurisdiction and

19

the plaintiff's claim for relief." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean, Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008).

Although the QTA simultaneously establishes the Court's jurisdiction and a plaintiff's right to recover, the timeliness of Plaintiffs' claims are not "inextricably entwined" with the merits because each question requires the Court to consider different evidence and issues.  The question on the merits is whether "the 1962 easement is limited in scope" which requires the Court to consider the text of the easement, and, if necessary, various sources of extrinsic evidence, such as the Forest Service Handbook, the text of other Forest Service easements, and any contemporaneous communications between the parties concerning the scope of the agreement.  (*See* Doc. 42 at 18–25.)  Whereas the question of timeliness requires the Court to consider the Forest Service's historic treatment of Robbins Gulch Road by considering evidence like historic maps, signs, administrative closures, or direct communications between the parties.  (*See* Doc. 31 at 27–37.)  These questions are different because the latter does not require the Forest Service to be correct—it only requires the Court to determine when a reasonable person would have understood the Forest Service believed its easement granted public access.

The Government asserts five specific notices to indicate that the statute of limitations has run, specifically: (1) the public's historic use of Robbins Gulch

Road and belief that this use is authorized; (2) the Forest Service's issuance of federal grazing permits; (3) the Forest Service's May 2006 temporary closure of Robbins Gulch Road; (4) its depiction of Robbins Gulch Road as an unrestricted road on various historic maps; and (5) the signs depicting Robbins Gulch Road as open for public use. The Court will consider only the historic maps and the May 2006 temporary closure.[3] Nevertheless, the Court agrees with the Government.

Although the Government does not pin down precisely when Plaintiffs' claims expired, the Government offers enough evidence for the Court to conclude that the statute of limitations ran before August 23, 2006,[4] the most telling of which is a series of historic Bitterroot Forest maps. The Government first submits a map of the region from 1950, twelve years prior to the Forest Service's acquisition of the easement. (Doc. 32-25.) This map depicts Robbins Gulch Road

---

[3] Plaintiffs assert that only government actions cause a claim's accrual—meaning the community's belief that Robbins Gulch Road is public is irrelevant. (Doc. 35 at 25.) The Court agrees in part. It will consider this testimony only to the limited extent that it conforms with the Forest Service's characterization of the road in its publicly available maps. Additionally, the Court declines to consider the Forest Service's issuance of grazing permits because Plaintiffs "do not dispute that the United States can . . . allow certain people to use the road," (id. at 24)—therefore the existence of grazing permits "peacefully coexists" with Plaintiffs' claims. Finally, the Court will not consider the sign posted on Plaintiff Jane Stanton's property in September 2006 stating "Public Access Thru Private Lands Next 1 Mile" because the evidence suggests the sign was posted within the twelve-year window. Although Stanton's statement that she permitted the Forest Service to place the sign on her property because "she didn't see why not" (Doc. 32-18 at 20) indicates that Stanton had actual knowledge of the Forest Service's adverse claim, the Court cannot determine when Stanton developed this knowledge from the posting of the sign.

[4] Plaintiffs filed their Complaint on August 23, 2018. (Doc. 1.) Therefore, to be timely, their claim must not have accrued prior to August 23, 2006.

as a non-system road in good motor condition that connects Highway 93 before

dead ending within the Bitterroot National Forest. (*Id.*) Then, in 1964, two years

after the Forest Service acquired its easement, it issued a map depicting Robbins

Gulch Road as Forest Road 446. (Doc. 32-26.) That it alternately listed Robbins

Gulch Road by a Forest Service numbered designation does not necessarily mean

the road was open to the public. Its 1964 map does not contain any route

restrictions. However, in 1972, 1981, and 1993 respectively, the Forest Service

displayed Robbins Gulch Road as an "improved road" in contrast to some other

roads characterized as "road[s] or trail[s] with restrictions—inquire [at the] local

forest service station." (Doc. 32-28, 32-27, 32-29.) Then, in 2005, the Forest

Service published a visitors map of the Bitterroot National Forest South Half

designed to help visitors "travel safely" and use the area lawfully. (*See* Doc. 32-

24.) This map depicted restricted roads by a lettered system corresponding to the

type of seasonal restriction. (*Id.*) Here again, Robbins Gulch Road is not depicted

as having any user restrictions. These maps tell a clear story—the Forest Service

has been informing the public since, at least, 1972 that it may access the Bitterroot

National Forest by using unrestricted road 446. What's more—the public heard

this message and has been using the road as a public access route since that time.

(Docs. 32-18 at 12 (Deposition of Plaintiff Jane Stanton who reports that hunters

and teenagers have openly used the road since 1990); 32-15 (Declaration of David

Coultas, whose grandparents granted the Forest Service its easement in 1962, states

that the easement was "intended to allow regular members of the public to use the

road, without having to ask anyone for permission"); 32-16 (Declaration of Lori

Connor, a predecessor-in-interest to Plaintiff Wilkin's property, observes that the

road "has always been intended to provide public access" and, growing up in the

surrounding community, her family used the road in this way); 32-12 (Declaration

of Dalton Christopherson who reports that since 1991 his family traveled Robbins

Gulch Road to go elk hunting each fall); 32-13 (Declaration of Laura Lindenlaud

who states that she has used the road two to three times per week seasonally since

2000); 32-14 (Declaration of Ric Brown who has "always considered it a road

open to the public" and has used it regularly since the 1960s or early 1970s).  A

reasonable landowner observing this public use would have known to check local

maps to see whether the road was designated as public or restricted.  Upon doing

so, a reasonable landowner would have been aware of the Forest Service's adverse

claim prior to August 23, 2006.

Finally, on May 3, 2006, pursuant to 36 C.F.R. 261.53 (which authorizes the

Forest Service to enact "special closures" for a variety of reasons including "public

health or safety") the Forest Service temporarily closed the road.  (Doc. 32-23.)

The Forest Service notified the public of its closure by erecting a physical barrier

and posting a sign.  (Doc. 32-22 at 31.)  Under the terms of the order, Robbins

23

Gulch Road was closed to public motorists absent three exceptions: persons with a permit authorizing the otherwise prohibited act (such as homeowners), first responders, and forest administrative personnel. (Doc. 32-23.) At first glance, erecting a road closure appears to be regulatory or supervisory action which is not inherently incompatible with Plaintiffs' theory of the easement. On closer inspection, however, this closure would have provided a reasonable landowner with notice of the Forest Service's adverse claim. By "expressly *excluding* the public during this time," the Forest Service communicated that it "viewed the road as [otherwise] *open* to the public." (Doc. 31 at 30.) If the Forest Service believed that Robbins Gulch Road was only open to residents and administrative personnel, it would not have needed to temporarily close the road while exempting those users. A reasonable landowner seeing this sign in May 2006 should have known the Forest Service believed its easement to provide public access. Although the record contains evidence that Plaintiffs' claims likely accrued sometime in the 1970s, the record is abundantly clear that it accrued, at the latest, on May 3, 2006. Accordingly, Plaintiffs have not met their burden to show that their claim is timely. The Court will dismiss this action for lack of jurisdiction.

IT IS ORDERED that the Findings and Recommendation (Doc. 53) is REJECTED. This case is dismissed for lack of subject matter jurisdiction.

24

IT IS FURTHER ORDERED that the Government's Motion to Dismiss (Doc. 30) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 41) is DENIED.

The Clerk of Court is directed to enter judgment of dismissal by separate document.

DATED this 26th day of May, 2020.

Dana L. Christensen, District Judge
United States District Court